IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| E. MARTYN GRIFFEN, | : | CIVIL ACTION |
|     Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| ALPHA PHI ALPHA, INC. ET AL., | : | NO. 06-1735 |
|     Defendants. | : | |

**MEMORANDUM AND ORDER**

GENE E.K. PRATTER, J.                                                                          MARCH 2, 2007

      Plaintiff E. Martyn Griffen filed a complaint against Alpha Phi Alpha, Inc., the Psi Chapter of Alpha Phi Alpha, Inc., and two individual defendants, Kelechi Okereke and Lionel Anderson-Perez, alleging that he was assaulted and battered during fraternal activities by these two fraternity members. He claims damages for the assault and battery, as well as for negligence, and intentional infliction of emotional distress from Messrs. Okereke and Anderson-Perez, and damages for negligence from the organizational defendants. Defendant Alpha Phi Alpha, Inc. has filed a Motion to Dismiss or in the Alternative Stay Litigation Pending Arbitration. The Court will grant the Motion and stay the litigation pending arbitration.

**I.     FACTUAL BACKGROUND**

      Plaintiff E. Martyn Griffen aspired to become a member of the Psi Chapter of Alpha Phi Alpha, Inc. at the beginning of his junior year of college at the University of Pennsylvania. At the time, Mr. Griffen was 20 years old and a resident of the State of Arkansas.

      Alpha Phi Alpha, Inc. (the "Fraternity") was formed in 1905 at Cornell University by a group of African-American students who bonded together in order to "survive in the racially hostile environment." See http://www.alphaphialpha.net (last visited Feb. 17, 2007). The Fraternity's roster contains some of the most famous and highly respected men in our country's history, including, W.E.B. DuBois, Martin Luther King, Jr. and Thurgood Marshall, among

others.  The Fraternity is now an international organization, headquartered in Baltimore, Maryland with undergraduate, graduate and alumni chapters throughout the United States and foreign countries.

The Fraternity required all aspirants,[1] including Mr. Griffen, to complete an Official Application for Membership in order to become a member of the Fraternity.  The present dispute turns on the enforceability and scope of the Application's arbitration clause, and specifically, whether it is applicable to the injuries Mr. Griffen allegedly suffered during Fraternity activities.

To become a member of the Fraternity, Mr. Griffen and other hopeful candidates were first required to complete an Official Application for Membership.  The Application included instructions on how to complete the form and submit the required materials, a "Membership Process" form, a standard form for basic personal identifying information, several sponsorship forms, and a list of the materials, such as a resume, an essay and a transcript, that Applicants were to submit in support of their candidacy for membership.  (Def.'s Mot. Ex. 1A.)

The Membership Process form (the "Form") is a one-page document, placed prominently in the front of the Application.  It contains information for aspirants about the details of the "Intake process" into the Fraternity.[2]  The Form consists of four paragraphs:  (1) a description of the Intake process; (2) a declaration opposing hazing in any form; (3) a description of the Fraternity's dispute resolution process; and (4) a certification that the aspirant agrees to abide by the conditions of the Intake process.

---

1    The Fraternity no longer refers to students who wish to become members as "pledges."  Instead, students who seek membership in the organization are deemed "aspirants."

2    The Intake process, is, or perhaps used to be, known informally to the general public as "pledging."  The Fraternity, like many other Greek organizations, has abolished pledging and pledge lines in an avowed effort to prohibit hazing.

The first and second paragraphs of the form discuss the Intake process. Paragraph one of the Form describes the steps and milestones that candidates must achieve to proceed through the Intake process. These steps included attending Leadership Weekends and presentations, performing community service, interviewing with the current Chapter members, and meeting certain financial obligations, among other things. (Form ¶ 1.) The second paragraph of the Form states the Fraternity's strict prohibition against illegal activities and hazing, whether physical or mental, as a term or condition of membership. It also requires an agreement from the aspirant not to participate in these activities, and an assurance that the Fraternity's members agree not to require aspirants to engage in any prohibited hazing. (Form ¶ 2.)

The third paragraph of the Form is at the center of the present dispute. It instructs aspirants regarding the procedure and process for membership Intake dispute resolution. The paragraph reads:

> Any grievances and disputes regarding membership intake should generally be referred to the National director of Membership Services for Investigation and resolution. Matters that cannot be resolved within the Fraternity will be referred to arbitration. The aspirant specifically agrees to follow all the rules, regulations and guidelines relating to the Intake process. The aspirant further agrees to report in writing any Infractions and Violations of the rules, regulations and guidelines relating to the Intake process to: The National Director of Membership Services. . .The aspirant acknowledges that [the Fraternity] is an International organization with Chapters located throughout the United states of America and foreign countries. The aspirant recognizes that by making this application for membership he agrees to the foregoing matters. The aspirant understands that this agreement has an effect on interstate commerce and is subject to the Federal Arbitration Act. The aspirant, his heirs and assigns, and [the Fraternity], its officers, employees, agents, affiliates, chapters and members, agree that any and all disputes, conflicts, claims and/or causes of action of any kind whatsoever, [i]ncluding by not limited to: contract claims, personal injury claims, bodily injury claims, injury to character claims and property damage claims arising out of or relating in any manner whatsoever to the Intake process and application shall be

>subject to and resolved by compulsory and binding arbitration under the Federal Arbitration Act, 9 U.S.C. Section 1, et seq. and the commercial rules of the American Arbitration Association.

(Form ¶ 3.)

The Fraternity required each aspirant to place his initials at the bottom of each of the above paragraphs, and to sign a certification, in paragraph four, that he read, understood, and agreed to abide by the terms and conditions of the Intake process, as described in the Form. (Form ¶ 4.) The Form also provided space for the supplemental certification of a parent or guardian for applicants under the age of 21. Id. Mr. Griffen initialed each of the paragraphs, and signed his name to the Form's certification on September 12, 2005. It appears from the Form that Patricia L. Griffen, Plaintiff's mother, signed the certification on the same date.[3]

Unfortunately for all parties, shortly after completing the Application, Mr. Griffen's Intake into Psi Chapter was interrupted by allegations of physical and verbal abuse. (Compl. ¶¶ 13-14.) Late in the evening of October 12, 2005, Mr. Griffen and other aspirants were summoned to the Fraternity house by members of the Psi Chapter in order to study and prepare for Chapter activities. (Compl. ¶¶ 10-11.) During this visit to the Fraternity house, Mr. Griffen claims that Defendant-Psi Chapter members Lionel Anderson-Perez and Kelechi Okereke punished him, and other aspirants, for the actions of another aspirant, Jamol Pendor, who allegedly broke Fraternity rules by revealing Fraternity secrets to a non-Fraternity audience.[4] (Compl. ¶¶ 12-14.)

---

3   Patricia L. Griffen submitted an affidavit in which she denies that the signature to this certification is hers. (Pl.'s Supplemental Resp., Ex. 1 at ¶ 3.)

4   Mr. Anderson-Perez was a graduate member of Psi Chapter and Mr. Okereke was an undergraduate member. (Compl. ¶¶ 16-17.)

According to Mr. Griffen, the punishment was physical, and constituted "underground pledging," in violation of the Fraternity's own rules and the University's anti-hazing policy. (Compl. ¶¶ 18, 21.) Mr. Anderson-Perez allegedly punched Mr. Griffen repeatedly in the thighs, and Mr. Okereke snapped a rubber band around Mr. Griffen's upper arm. (Compl. ¶ 15.) As a result of the physical abuse, Mr. Griffen claims to have suffered serious and permanent injuries, including myositis ossificans and heterotopic ossification[5] of his thigh muscles, and permanent scarring of his upper arm. (Compl. ¶ 23.) Mr. Griffen claims that the Fraternity either knew of, or should have known of the underground pledging, and negligently failed to prevent the banned activities resulting in his injuries. (Compl. ¶¶ 21-22.)

On April 25, 2006, Mr. Griffen filed a ten-count Complaint against Messrs. Anderson-Perez and Okereke, as well as Psi Chapter and the Fraternity. The Fraternity now moves the Court to order that arbitration, and not a judicial forum, is the proper venue to resolve Mr. Griffen's claims. Because the arbitration clause at issue is enforceable, and binds all parties to this dispute to arbitrate Mr. Griffen's claims arising out of the personal injuries he allegedly incurred during the Intake process, the Court will stay this litigation pending arbitration.

## II.   LEGAL STANDARD

A motion to stay litigation pending arbitration pursuant to § 3 of the Federal Arbitration Act ("FAA")[6] is reviewed under the summary judgment standard of Rule 56(c) of the Federal

---

5   Myositis ossificans and heterotopic ossification refer to the abnormal formation of true bone within extrasokeletal soft tissues due to spinal cord or localized traumatic injury.

6   As a preliminary matter, the parties do not dispute, and the Membership Process Form clearly states, that the FAA applies to the present controversy. The Form states: "the aspirant understands that this agreement has an effect on interstate commerce and is subject to the [FAA]." (Form ¶ 3.) The FAA extends to the limits of Congress' Commerce Clause power, Allied-Bruce Terminix Companies, Inc. v. Dobson, 513 U.S. 265, 270 (1990), and Congress' Commerce Clause power "may be exercised in individual cases without showing any specific effect upon interstate commerce" if in the aggregate the economic activity in question would represent "a general practice . . . subject to federal control." Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 57 (2003) (citing Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 236 (1948)). Interstate commerce is clearly implicated in the present controversy. The Fraternity is a national organization, headquartered in Maryland, with chapters in many states. Mr. Griffen is a resident of Arkansas and he

Rules of Civil Procedure because the ruling will result in a summary disposition of the issue of whether the parties have agreed to arbitrate.[7]  Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51, 54 n. 9 (3d Cir. 1980); Bellevue Drug Co. v. Advance PCS, 333 F. Supp. 2d 318, 322 (E.D. Pa. 2004).

Consistent with this standard, only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not agree to arbitrate their claims.  Kiesel v. Lehigh Valley Eye Ctr., P.C., 2006 U.S. Dist. LEXIS 47486, at *7 (E.D.  Pa. Jul. 12, 2006) (citing Par-Knit Mills, 636 F.2d at 54). Furthermore, a motion to stay litigation pending arbitration "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc., 247 F.3d 44, 54-55 (3d Cir. 2001) (quotations omitted).  This is so because the legislative goal of the FAA was ostensibly to "reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place

---

executed the Fraternity's Application in Pennsylvania.

7   The FAA "provides two parallel devices for enforcing an arbitration agreement: a stay of litigation in any case raising a dispute referable to arbitration, 9 U.S.C. § 3, and an affirmative order to engage in arbitration, § 4." Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 23, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983). While the devices are similar, a § 3 motion to stay court proceedings, unlike a § 4 motion to compel arbitration, provides no right to a jury trial to resolve disputed factual issues.  Kiesel, 2006 U.S. Dist. LEXIS 47486, at *7 (citing J & R Sportswear & Co. v. Bobbie Brooks, Inc., 611 F.2d 29, 30 (3d Cir. 1979)). Although the Movant designates the present motion as one to stay litigation pending arbitration pursuant to § 3, at oral argument counsel for Mr. Griffen expressed confusion on this point, due to the text of the Motion, as to whether the Fraternity moved pursuant to § 3, or § 4, or both.  It appears to the Court that despite some lack of clarity, the Fraternity moves pursuant to § 3.  Moreover, it is the proper course for the Court to stay litigation pursuant to § 3 prior to compelling arbitration pursuant to § 4.  Bender v. A.G. Edwards & Sons, Inc., 971 F.2d 698, 699 (11th Cir. 1992) ("Upon finding that a claim is subject to an arbitration agreement, the court should order that the action be stayed pending arbitration.  9 U.S.C. § 3.  If the parties do not proceed to arbitration, the court may compel arbitration. 9 U.S.C. § 4.")

arbitration agreements upon the same footing as other contracts." Varallo v. Elkins Park Hosp., 63 F.App'x 601, 603 (3d Cir. 2003) (quoting Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24, 114 L. Ed. 2d 26, 111 S. Ct. 1647 (1991)).

Nevertheless, in evaluating whether to grant the Fraternity's § 3 motion to stay proceedings without conducting an evidentiary hearing, the Court must consider all evidence presented by the party opposing arbitration and construe all reasonable inferences in that party's favor, Bellevue Drug Co., 333 F. Supp. 2d at 322, and "give to the opposing party. . .the benefit of all reasonable doubts and inferences that may arise." Kiesel, 2006 U.S. Dist. LEXIS 47486, at *8.

### III.   DISCUSSION

Section 2 of the FAA provides that "[a] written provision in. . .a contract evidencing a transaction involving commerce to settle by arbitration a controversy arising out of such contract. . .shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for revocation of any contract." 9 U.S.C. § 2. In determining whether an arbitration is the proper forum for resolution of the dispute, a court must first ask whether the parties entered into a valid arbitration agreement and, if so, whether the dispute between the parties falls within the language of the arbitration agreement. S & G Elec., Inc. v. Normant Sec. Group, Inc., 2007 U.S. Dist. LEXIS 5395, at *20 (E.D. Pa. Jan. 24, 2007). To conduct this analysis, the court applies ordinary contract law principles.[8]

#### A.   **Validity and Enforceability**

---

[8]   As the court noted in Ostroff v. Alterra Healthcare Corp., 433 F. Supp. 2d 538, 542 (E.D. Pa. 2006), "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2 [of the FAA]." (quoting Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 687, 116 S. Ct. 1652, 134 L. Ed. 2d 902 (1996)); Harris v. Green Tree Fin. Corp., 183 F.3d 173, 179 (3d Cir. 1999).

This Court may not direct the parties to arbitration unless the agreement to arbitrate is valid, Alexander v. Anthony Int'l L.P., 341 F.3d 256, 264 (3d Cir. 2003), and here, Mr. Griffen argues that the arbitration clause, and the process by which he entered into the contract for membership in the Fraternity, are unconscionable. As a preliminary matter, because Mr. Griffen challenges the substantive unconscionability of the arbitration clause itself, the Court is permitted to decide validity of the clause. Buckeye Check Cashing, Inc. v. Cardegna, 126 S. Ct. 1204, 1210, 163 L. Ed. 2d 1038 (2006) (challenges to the validity of a contract as a whole are within the province of the arbitrator, and not the court, however, if the challenge places the validity of the arbitration clause itself in issue, the court may resolve the dispute). See also Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403-404, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967); Ostroff, 433 F. Supp. 2d at 544 (citations omitted).

Though questions concerning the interpretation and construction of arbitration agreements are determined by reference to federal substantive law, Harris, 183 F.3d at 179, the laws of the states yield "generally applicable contract defenses" to the validity of an agreement to arbitrate. Kiesel, 2006 U.S. Dist. LEXIS 4748, at *11. As a defense to validity, unconscionability relieves a party from an unfair contract or from an unfair portion of a contract. Id. at *13 (citing Harris, 183 F.3d at 181). The party challenging an arbitration provision "generally bears the burden of proving unconscionability," id., and must prove that the arbitration clause is both procedurally and substantively unconscionable. Ostroff, 433 F. Supp. 2d at 541.

### i. Procedural Unconscionability

Mr. Griffen argues that the Application is procedurally unconscionable because it is a contract of adhesion. A contract is procedurally unconscionable when the circumstances

surrounding its formation reflect "the absence of meaningful choice on the part of one of the parties." Witmer v. Exxon Corp., 432 A.2d 1222, 1228 (Pa. 1981). Contracts of adhesion are characterized by this absence of choice; they are "standard form contract[s] prepared by one party, to be signed by the party in a weaker position, [usually] a consumer, who has little choice about the terms." Kiesel, 2006 U.S. Dist. LEXIS 47486, at *14 (quoting Lytle v. CitiFinancial Servs., Inc., 2002 Pa. Super. 327, 810 A.2d 643, 658 (Pa. Super. Ct. 2002)).

Commonly, adhesion contracts are accompanied by conditions that prevent a consumer from obtaining a product or services except by acquiescing to the contract. Dabney v. Option One Mortgage Corp., 2001 U.S. Dist. LEXIS 410543, at *4 (E.D. Pa. Apr. 19, 2001). They are prepared by a party with excessive bargaining power and presented to the other party on a "take it or leave it" basis. Ostroff, 433 F. Supp. 2d at 543 (quoting Parilla v. IAP Worldwide Services, VI, Inc., 368 F.3d 269, 276 (3d Cir. 2004)). For this reason, contracts of adhesion are generally procedurally unconscionable. Kiesel, 2006 U.S. Dist. LEXIS 47486, at *14; Ostroff, 433 F. Supp. 2d at 544 (citing Parilla, 368 F.3d at 276).

Though this Application bears attributes of a contract of adhesion, the Court cannot conclude, without an evidentiary hearing, whether the circumstances attendant to the formation of the contract were unconscionable. While it is clear that the Fraternity, a sizeable international organization, unilaterally prepared the Application, there is no evidence of record that the Fraternity refused to negotiate the terms of the contract, or that Mr. Griffen did not understand the contract, or that he found it unfair at the time he entered it.[9] Compare Ostroff, 433 F. Supp. 2d at 540 (the court ruled that the contract in question was an unconscionable contract of adhesion where the plaintiff, an elderly woman's daughter, presented evidence that she asked the

---

9   The record does reveal, however, that Mr. Griffen at the very least had ready access to lawyers who were present in his life on an everyday basis. Mr. Griffen worked in the Office of the General Counsel at the University of Pennsylvania, and his father is a lawyer. (Tr. 11:10-11:19.)

defendant-assisted living provider if her attorney could review and recommend changes to the provisions of her mother's residency agreement, and the defendant refused).

There is also no evidence of record as to whether Mr. Griffen lacked a meaningful choice of whether or not to enter the membership contract. The Court cannot say whether he did or did not have the opportunity to join another Fraternity if this provision was unacceptable to him. Dabney, 2001 U.S. Dist. LEXIS 4949, at *13-14.[10] Furthermore, it would not be appropriate to characterize the circumstances of Mr. Griffen's decision to join Alpha Phi Alpha as similar or equivalent to the dire economic or subsistence constraints accompanying the situations where courts have found a lack of meaningful choice, and thus, an invalid contract of adhesion. Compare Ostroff, 433 F. Supp. 2d at 544 (plaintiff's elderly mother was evicted from her former home and had no place to live but for the defendant's assisted living community); Trailer Marine Transport Corp. v. Charley's Trucking Inc., 20 V.I. 282 (1984) (a small trucking company entered into a contract with a larger trucking company that contained an egregious liability provision because it relied on the contract for its economic livelihood). See Dabney, 2001 U.S. Dist. LEXIS 4949, at *14 (even the existence of debt is not sufficient to preclude meaningful choice of whether to enter into a loan agreement).

Finally, there are no procedurally unconscionable aspects apparent in the form of the arbitration clause at issue here. The arbitration clause is contained in the Membership Process

---

10  Plaintiff submitted a supplement to his Response containing an affidavit from Patricia L. Griffen, Plaintiff's mother, who attested to the fact that she did not sign the Membership Process Form. (Pl.'s Supplemental Resp., Ex. 1 at ¶ 3.) Plaintiff argues that the fact that Ms. Griffen did not sign the Form either a) rendered the contract, as a whole, invalid, or b) is evidence that Mr. Griffen was so desperate to join the Fraternity that he would commit a forgery (i.e. suggesting, without admitting, that Mr. Griffen forged his mother's signature). The Court notes that individuals over the age of 18, such as Mr. Griffen, enjoy capacity to contract in Pennsylvania, but finds that the question of the enforceability of the contract as a whole is for the arbitrator, and is not for the Court to determine. Ostroff, 433 F. Supp. 2d at 542 (citing Buckeye, 126 S. Ct. at 1210). Second, the fact that Mr. Griffen may have forged his mother's signature does not prove any activity on the part of the Fraternity that constitutes any type of duress or unconscionability. Instead, it proves that like many other college students, he did not always involve his parents in his decisions.

Form which was placed prominently in the front of the Application, and Mr. Griffen initialed the bottom of the paragraph containing the arbitration clause, indicating that he had read and acknowledged the clause in particular.  Compare Moscatiello v. Pittsburgh Contractors Equip. Co., 595 A.2d 1190, 1196-97, 407 Pa. Super. 363 (Pa. Super. 1991) (finding disclaimer of warranties clause that appeared in fine print and on reverse side of sales agreement unconscionable, where disadvantaged party was not an experienced buyer).

However, even if Mr. Griffen had pleaded sufficient facts to warrant an evidentiary hearing to determine procedural unconscionability, or if he had proved procedural unconscionability without the need for a hearing, he has not carried the second-prong of his burden to persuade the Court that the membership contract is substantively unconscionable.

### ii.     Substantive Unconscionability

Substantive unconscionability looks to the terms of the arbitration clause itself and whether the arbitration clause is unreasonably favorable to the party with greater bargaining power.  Witmer, 434 A.2d at 1228.  In Ostroff, 433 F. Supp. 2d at 543, the court set forth the variety of constraints an arbitration clause may impose that render it substantively unconscionable.  All of the unconscionable provisions recited by the court in that case are characterized by an inequitable restriction that is unevenly imposed upon the "weaker" party to the agreement.  For instance, an arbitration provision is substantively unconscionable when the clause severely restricts discovery for the weaker party, places the burden of costs on the weaker party, limits the remedies available to the weaker party, limits the period in which the weaker party may bring a claim, raises the burden of proof of claims higher than the burden of proof in a judicial forum, or provides only the stronger party with judicial recourse.  Ostroff, 433 F. Supp. 2d at 543 (citations omitted).

None of Ostroff's specific criteria of unconscionability are found in this case. The arbitration clause does not restrict discovery, it has no cost shifting provisions, no limitation of remedies, and no unilateral access to the courts. (Form ¶ 3.) Moreover, the arbitration clause at issue does not "create an arbitration procedure that favors one party over another." Ostroff, 433 F. Supp. 2d at 543 (quoting Johnson v. West Suburban Bank, 225 F.3d 366, 378 n. 5 (3d Cir. 2000)). See also Seus v. John Nuveen & Co., Inc., 1997 U.S. Dist. LEXIS 8209, at *9-10 (E.D. Pa. June 2, 1997) (to invalidate an agreement as an adhesion contract, the plaintiff must also show that the contractual terms unreasonably favor the other party).

Though Mr. Griffen argues that the nature of binding arbitration is in itself so restrictive as to be substantively unconscionable, this Court will not rule, inconsistent with the law in favor of private arbitration, that alternative dispute resolution is unfavorable to Mr. Griffen or in general.[11] Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110, 1113 (3d Cir. 1993) (quoting Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 225-26, 96 L. Ed. 2d 185, 107 S. Ct. 2332 (1987)) (originally passed in 1925, the FAA was enacted to "reverse centuries of judicial hostility to arbitration agreements" by "placing arbitration agreements upon the same footing as other contracts" ).

---

11  Mr. Griffen argues that binding arbitration will render discovery unavailable. However, the American Arbitration Association's Commercial Arbitration Rules provide:

R-21.  Exchange of Information

(a) At the request of any party or at the discretion of the arbitrator, consistent with the expedited nature of arbitration, the arbitrator may direct

i) the production of documents and other information, and

ii) the identification of any witnesses to be called.

(b) At least five business days prior to the hearing, the parties shall exchange copies of all exhibits they intend to submit at the hearing.

(c) The arbitrator is authorized to resolve any disputes concerning the exchange of information.

Therefore, unlike in Ostroff, 433 F. Supp. 2d at 541, Mr. Griffen's opportunity to obtain discovery is not foreclosed.

Moreover, fraternity hazing does not present a novel issue outside the purview of what is appropriate for arbitration. Mr. Griffen argues that public policy, coupled with the nature of binding arbitration, counters the presumption of arbitrability. Substantive unconscionability can be grounded on public policy concerns, provided that the public policy is derived from law or precedent and not couched in general terms of morality. Hall v. Amica Mut. Ins. Co., 538 Pa. 337, 347-348 (Pa. 1994). In this case, Mr. Griffen submits that based on the Pennsylvania Antihazing Statute, 24 P.S. §5351 et seq., which criminalizes hazing, and the serious health and safety factors compelling the passage of this statute, judicial resolution and the attendant disclosure of the adjudication is necessary in order to protect the population of students and applicants to the University of Pennsylvania and the public at large.

While it is clear, as Mr. Griffen argues, that incidents of hazing are, with virtual unanimity, regarded with disdain in society, the Court will not subordinate the objectives of the FAA, Southland Corp. v. Keating, 465 U.S. 1, 10 (1984) (in enacting the FAA, Congress "withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration"), and the freedom of contract, all while purporting to speak for the Pennsylvania legislature.[12] The Court cannot infer from the mere criminality of hazing in Pennsylvania a broad, over-riding intent to prohibit private resolution of hazing incidents.

Further, the Court finds no inconsistency between the important social policies protected and advanced by Pennsylvania's Antihazing statute and enforcing agreements to arbitrate claims of hazing, because both arbitration and judicial resolution of claims focus on specific disputes between the parties involved, and both can advance broader social purposes. See Gilmer v.

---

12   The Court also notes that Mr. Griffen did not mention the Pennsylvania Antihazing statute in his Complaint.

Interstate/Johnson Lane Corp., 500 U.S. 20, 27-28 (1991) (arbitration of claims under the ADEA is not inconsistent with the statute; additionally, claims under various other antitrust and securities laws and the civil provisions of the RICO are designed to advance important public policies, but still remain appropriate for arbitration).

Therefore, the Court finds that the arbitration provision in the Membership Process form is not substantively unconscionable, and, hence, the arbitration clause is valid and enforceable.[13] The Court must next determine whether Mr. Griffen's claims fall within the net cast by the arbitration provision.

### B.     Scope of Enforceability

Before a court may stay proceedings or compel arbitration, it must also ensure that a specific dispute falls within the substantive scope of an arbitration agreement. Kiesel, 2006 U.S. Dist. LEXIS 47486, at *18. To determine whether a claim falls within the scope of an arbitration agreement, the court must focus on the factual underpinnings in the complaint rather than the legal theories or causes of action asserted. Varallo, 63 F.App'x at 603 (citing Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 846 (2d Cir. 1987)). "If these factual allegations 'touch matters' covered by the parties' contract, then those claims must be arbitrated, whatever the legal labels attached to them." Id. (quoting Genesco, 815 F.2d at 846). Moreover, "any doubts concerning

---

13   Mr. Griffen also asserts that the recent case of Hudyka v. Sunoco Inc., 2007 U.S. Dist. LEXIS 5971 (E.D. Pa. Jan. 26, 2007) (Savage, J.) supports the argument for substantive unconscionability. He interprets the case to discourage enforcement of mandatory arbitration when the arbitration agreement involves the waiver of one party's statutory right to a judicial forum. However, as the Fraternity points out, Plaintiff's analysis is incomplete. Hyduka offers guidance on the contractual defense of incomplete formation. In Hudyka, the court held that the plaintiff had never accepted defendant's offer to enter into the contract because defendant did not communicate its terms to plaintiff. Id. at *10. The court held that the deprivation of the right to a judicial forum, and compulsory arbitration, are inappropriate where the defendant has not communicated the terms of the clause for a plaintiff to accept, id. at *10-11, the terms themselves were ambiguous as to whether arbitration was compulsory, id. at *12, and plaintiff was not a signatory to the arbitration agreement. Id. at *14-15. The Fraternity's arbitration clause, and Mr. Griffen's consent to be bound by the clause, do not share the defects of the factual scenario presented in Hyduka.

the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Id.  (quoting Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25).

In the context of this presumption of arbitrability, Mr. Griffen contends that the arbitration clause in the Membership Process Form applies to claims of "personal injury" and "bodily injury" (Form ¶ 3), but absolutely exempts claims arising from hazing incidents such as those he presently alleges.  Because the Fraternity specifically prohibited hazing (Form ¶ 2) as a part of the Intake process, he argues, his injuries did not "relate to" or "arise out of" the Intake process.

However, the Court finds that it is not, as Mr. Griffen characterizes, "incomprehensible" that the arbitration clause includes personal injury arising out of "hazing" as a matter that is subject to arbitration.  A plain reading of the clause makes clear that clause is sufficiently broad to include the factual underpinnings of Mr. Griffen's injuries:

> the aspirant. . .[Fraternity]. . .chapters and members, agree that any and all disputes, conflicts claims and/or causes of action of any kind whatsoever, including but not limited to: contract claims, personal injury claims, bodily injury claims, injury to character claims and property damage claims arising out of or relating in any manner whatsoever to the Intake process and application shall be subject to and resolved by compulsory and binding arbitration. . .

(Form ¶ 3.)

Moreover, inasmuch as Mr. Griffen pursues the legal strategy of characterizing the origins of his injuries as hazing-related, the Court must look to the factual underpinnings of the claims, and not the legal theory, in determining arbitrability.  Varallo, 63 F.App'x at 603.  Mr. Griffen had completed, and the Fraternity had accepted, his Application, and because he had paid his fraternity dues, he had entered the Intake process phase of his membership candidacy.

As alleged in the Complaint, Mr. Griffen was engaged in fraternity activities at the time he became injured. He claims to have been at the Psi Chapter house, summoned there by members of the Chapter for fraternity study time, when his injuries occurred. Whether the Fraternity calls the process "pledging" or "Intake," Mr. Griffen's alleged injuries relate to this process of becoming a member of the Fraternity. For these reasons, the Court holds that the personal injuries alleged by Mr. Griffen are within the scope of the arbitration clause of the Application.

Finally, the Court must consider whether the inclusion of Psi Chapter and the individual defendants in this action renders the dispute inarbitrable. Mr. Griffen correctly asserts that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1960). The arbitration clause states: "The aspirant, his heirs and assigns, and Alpha Phi Alpha Fraternity, Inc., its officers, employees, agents, affiliates, chapters and members agree. . .that any and all disputes. . .shall be resolved by compulsory and binding arbitration. . ."(Form ¶ 3)(emphasis added).

The agreement clearly binds the Fraternity and the Psi Chapter to arbitration. (Def.'s Mot. To Set Aside Default, Aff. of Sean Walker, Ex. A)(Psi Chapter agreed to be bound by the rules and conditions of the Intake process.) While the Fraternity would not ordinarily have the authority to bind its individual members to a contract, by signing separate agreements with the Fraternity, Messrs. Okereke and Anderson-Perez actually bound themselves to the same agreement to arbitrate any claims of personal injury as did Mr. Griffen. (Def.'s Supplemental Exhibits, Docket Nos. 29, 30.) Though not executed simultaneously, the intent of all the parties to this litigation to be bound by the compulsory arbitration of the present claims is clear.

Moreover, it can be said that the execution of the Application in counterparts and the resulting obligation of the members to adhere to all provisions of the Application, e.g. that "[n]o member of the Fraternity is authorized to require any aspirant to engage in any prohibited membership activities suggest or Impose any term," (Form ¶ 2), certainly was part of the benefit of the bargain entered into by Mr. Griffen.

IV.   **CONCLUSION**

For the reasons stated herein, the Court will stay litigation[14] pending arbitration of Plaintiff Griffen's claims.  An appropriate Order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

14   The Court will not dismiss the claims against Psi Chapter and the Fraternity.  "[T]he plain language of [FAA] § 3 affords a district court no discretion to dismiss a case where one of the parties applies for a stay pending arbitration. The [statute's] directive that the Court 'shall' enter a stay simply cannot be read to say that the Court shall enter a stay in all cases except those in which all claims are arbitrable and the Court finds dismissal to be the preferable approach." Lloyd v. Hovensa, 369 F.3d 263, 269 (3d Cir. 2004).

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **E. MARTYN GRIFFEN,** : | CIVIL ACTION |
| Plaintiff : | |
| : | |
| v. : | |
| : | |
| **ALPHA PHI ALPHA, INC. ET AL.,** : | NO. 06-1735 |
| Defendants. : | |

# ORDER

**AND NOW**, this 2nd day of March 2007, upon consideration of defendant Alpha Phi Alpha, Inc.'s Motion to Dismiss or in the Alternative Stay Litigation Pending Arbitration (Docket Nos. 10, 19); and Plaintiff's Response thereto (Docket Nos. 12, 18), **IT IS HEREBY ORDERED** that the Motion to stay the instant litigation is **GRANTED,** and this action is stayed pending submission and disposition of the underlying dispute to contractual arbitration. It is further **ORDERED** that Plaintiff's Motion and two Amended Motions to Compel Discovery Responses of Lionel Anderson-Perez (Docket Nos. 26, 27, 28) are **MOOT**.

This action is placed in **SUSPENSE** pending conclusion of the arbitration proceedings.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE